# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JASON LEOPOLD and, | : | | |
| BUZZFEED, INC., | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 19-978 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 10, 11 |
| | : | | |
| CENTRAL INTELLIGENCE AGENCY, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

**DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

This case is closely related to *Leopold v. CIA* ("*Leopold I*"), 380 F. Supp. 3d 14 (D.D.C. 2019), which was decided by this Court less than a year ago. Both cases were brought under the Freedom of Information Act ("FOIA") and concern FOIA requests made by journalist Jason Leopold and Buzzfeed, Inc (together, "Buzzfeed"). The requests in *Leopold I* and in this litigation are similar and both seek, generally, Central Intelligence Agency ("CIA" or "the Agency") records relating to an alleged covert government program to arm Syrian rebels as well as CIA records referencing a tweet by President Donald J. Trump that allegedly revealed the existence of the program. At this stage, this case only concerns the former category of records. The CIA has moved for summary judgment, arguing, as it did in *Leopold I*, that it properly refused to disclose the existence or absence of records relating to the alleged covert program (a so-called "*Glomar* response"). Last time, generally, the ACLU sought records of CIA payments to Syrian rebel groups, and this Court granted summary judgment to the Agency, largely because even though the President's tweet had revealed the existence of payments to rebel groups, it had not revealed that the CIA, specifically, had made them. *See id.* at 24–26. The key difference this

time around is that Buzzfeed has made its requests broader. Now, instead of asking for records of *CIA* payments, they simply seek records of "payments," without suggesting that the payments came from the CIA. With the question broadened in this way, it is now implausible for the CIA to claim that it cannot say one way or another whether it has any records concerning these payments. Undoubtedly, wherever the payments were coming from, the CIA must have some intelligence awareness of them. Accordingly, the CIA's motion is denied, the Plaintiffs' motion is granted, and the agency is ordered to search for responsive documents.

## I. FACTUAL BACKGROUND

The facts of *Leopold I* provide important background for the FOIA request at issue and for the legal arguments presented by both parties. Accordingly, in recounting the background of this case, the Court will also review some of the history and the substance of *Leopold I*.

On July 19, 2017, the Washington Post published an article describing the Trump Administration's termination, a month earlier, of what the article described as a covert CIA program to arm rebels to the government of Bachar Al-Assad in Syria. Greg Jaffee & Adam Entous, *Trump Ends Covert CIA Program to Arm Anti-Assad Rebels in Syria, a Move Sought by Moscow*, Washington Post, July 19, 2017, Pls.' Cross Mot. Summ. J. Ex. 1, ECF No. 12-3 at 2–5; Def.'s Statement of Material Facts ("Def. SMF") ¶ 2, ECF No. 10-3; Pls.' Resp. to Def.'s SMF ¶ 2, ECF No. 11-2. Five days later, the President tweeted from his Twitter account, @realDonaldTrump, that "[t]he Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad." @realDonaldTrump, Twitter (July 24, 2017, 7:23 PM), https://twitter.com/realdonaldtrump/status/889672374458646528. In an interview with the Wall Street Journal the next day, the President referenced "the story about Syria . . . the other day" and said that it "was a decision

2

made by people, not me. . . . That was not something that I was involved in, other than they did come and they suggested. It turns out it's – a lot of al-Qaida we're giving these weapons to." Excerpts from President Donald Trump's Interview with the Wall Street Journal, July 25, 2017, Cross-MSJ Ex. 2, ECF No. 12-3 at 5.

On September 12, 2017, Buzzfeed submitted to the CIA the FOIA request that would become the subject of *Leopold I*. *Leopold I*, 380 F. Supp. 3d at 19. There were six subparts to the request. *Id.* Five sought, generally, "records related to an alleged program of CIA payments to Syrian rebels fighting the Assad government." *Id.* Part four of the request sought "any and all records that mentions or refers to the July 24, 2017 [tweet] by President Donald Trump." *Id.* at 20 (quoting Compl. ¶ 10, *Leopold I*, 380 F. Supp. 3d 14, ECF No. 1 [hereinafter "*Leopold I* Compl."]). When the CIA failed to respond to the request, Buzzfeed filed suit on October 19, 2017. *Id.* The parties agreed that the request would be restricted to exclude records produced as part of the CIA's response to a similar FOIA case. *Id.* Then, on February 1, 2018 the parties informed the Court that "the CIA had issued a *Glomar* response with respect to the entire request pursuant to FOIA Exemptions 1 and 3, but that it would be conducting a search for records responsive to part 4 of the request that referenced the presidential tweet but did not implicate the alleged covert CIA program. *Id.* This limited search resulted in the production to Buzzfeed of two emails, in redacted form. *Id.* "The CIA moved for summary judgment . . . arguing both that its *Glomar* response to the request was valid and that the limited search" was an adequate response to part four of the request. *Id.* Buzzfeed filed a cross-motion for summary judgment, *id.*, arguing "that the CIA's *Glomar* response [was] improper because President Trump officially acknowledged the existence of a covert CIA program of payments to Syrian rebels in his July 24, 2017 tweet," *id.* at 22.

3

The Court granted summary judgment to the CIA and denied it to Buzzfeed. *Id.* at 30. The Court found first, "that the tweet alone [was] not sufficiently precise to constitute an official acknowledgment of a CIA program of payments to Syrian rebels." *Id.* at 24. Assuming the tweet had officially acknowledged *some* program, it made no mention of the CIA. *See id.* at 24 & n.3. Although the Jaffee and Entous article alleging a covert CIA program had come out a few days prior, the tweet did not reference the Jaffee and Entous article specifically, and it suggested that the Washington Post had gotten the facts wrong. *Id.* at 24–25. "[T]he President's characterization of the facts in the article as 'fabricated' negates any inference that can be drawn from it as to the source of the payments," the Court said, and Buzzfeed recognized that the Department of Defense could also plausibly have been behind the payments. *Id.* at 25 & n.5. The CIA's *Glomar* response was thus appropriate, "under Exemption 1 because revealing whether or not the agency operates a covert program of payments to Syrian rebels would disclose classified material," and under Exemption 3 because, as the CIA represented, "[t]he fact of whether or not the CIA is, or has, exercised covert action authorities constitutes a protected intelligence source or method." *Id.* at 27, 28 (quotations omitted). The limited search for items responsive to part 4 of the request was also adequate. *Id.* at 28.

On July 2, 2018, while *Leopold I* was being litigated, but before this Court issued a decision on summary judgment, Buzzfeed submitted the FOIA request at issue in this case. Def. SMF ¶ 1, ECF No. 10-3; Pls.' Resp. to Def.'s SMF ¶ 1, ECF No. 11-2. Buzzfeed requested the following nine categories of records from the CIA:

1. Any and all studies, memos, assessments, and intelligence products referring to payments to Syrian rebels fighting Assad;
2. Any and all emails mentioning or referring to payments to Syrian rebels fighting Assad;

4

3. Any and all correspondence to or from a member of Congress or a Congressional Committee mentioning or referring to payments to Syrian rebels fighting Assad;
4. Any and all records that mention or refer to the July 24, 2017 [tweet] by President Donald Trump: https://twitter.com/realDonaldTrump/status/ 88967237445864528. The tweet states: "The Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad.....";
5. Any and all records mentioning or referring to the ending of payments to Syrian rebels fighting Assad; and
6. Any and all records authorizing payments to Syrian rebels fighting Assad. This request includes, but is not limited to, the "FINDING" authorized by President Barack Obama.
7. Any and all records mentioning or referring to payments to Syrian rebels fighting Assad.
8. Records pertaining to payments to Syrian rebels fighting Assad.
9. Any and all records mentioning or referring to any program to arm or train anti-Assad rebels in Syria.

Compl. ¶ 13, ECF No. 1; Def.'s SMF ¶ 1 ECF No. 10-3. The CIA acknowledged receiving the request on July 24, 2018 and Buzzfeed filed suit on April 8, 2019. Def. SMF ¶ 4–5, ECF No. 10-3; Pls.' Resp. to Def.'s SMF ¶ 4–5, ECF No. 11-2.

There are essentially two differences between the six-part *Leopold I* request and this nine-part request before the Court today. *Compare Leopold I* Compl. ¶ 10, *with* Compl. ¶ 13, ECF No. 1. Part four, the part focusing on records mentioning the President's tweet, is unchanged across the two requests. Parts one through three and five and six of the *Leopold I* request are replicated almost exactly in the 2018 request but, crucially, in each part, the suggestion or assumption that the payments were made by the CIA have been removed. For example, where, in *Leopold I*, Buzzfeed asked for "emails mentioning or referring to CIA payments to Syrian rebels fighting Assad," it is now seeking simply "emails mentioning or referring to payments to Syrian rebels fighting Assad." Likewise, "records authorizing the CIA to make payments" has become "records authorizing payments." The second difference is the addition of parts seven through nine, which are wholly new and lack comparators in *Leopold I*.

These request, for the first time, "records mentioning or referring to payments to Syrian rebels fighting Assad," "[r]ecords pertaining to payments to Syrian rebels fighting Assad," and "records mentioning or referring to any program to arm or train anti-Assad rebels in Syria." Compl. ¶ 13, ECF No. 1.

On June 20, 2019, the CIA issued a final response to Buzzfeed's request in the form of a letter from CIA Information and Privacy Coordinator Mark Lilly. Decl. of Antoinette B. Shiner ("Shiner Decl."), Ex. D ("Final Response Letter"), ECF No. 10-2 at 44–45; *see also* Def. SMF ¶ 6, ECF No. 10-3; Pls.' Resp. to Def.'s SMF ¶ 6, ECF No. 11-2. The letter informed Buzzfeed that "the CIA can neither confirm nor deny the existence or nonexistence of records responsive to items 1–3 and items 5–9 of your request, or records responsive to item 4, to the extent those records confirm or deny the existence or nonexistence of purported payments to Syrian rebels." Final Response Letter at 2, ECF No. 10-2 at 45.[1] The letter cited FOIA Exemptions 1 and 3. *Id.*

The CIA moved for summary judgment, arguing that its *Glomar* response was valid under Exemptions 1 and 3. Mem. in Supp. of Def.'s Mot. Summ. J. ("Def.'s MSJ") at 1–2, ECF No. 10-1. Buzzfeed opposed this motion and filed its own cross-motion for summary judgment. Mem. P. & A. in Opp. to Def.'s Mot. Summ. J. and in Supp. of Pls.' Cross-Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 11. Following further briefing, the cross-motions for summary judgment are now ripe for decision by the Court.

---

[1] The letter also explained that the CIA had "offered to conduct a limited search for certain records responsive to item four . . . to the extent those records did not confirm or deny the existence or nonexistence of purported payments to Syrian rebels." Final Response Letter at 2. Buzzfeed declined this offer and represented to the CIA that it would not be challenging the CIA's response to item four. *Id.* Accordingly, the search was not conducted *Id.*; *see also* Def. SMF ¶ 6, ECF No. 10-3; Pls.' Resp. to Def.'s SMF ¶ 6, ECF No. 11-2.

## II.  LEGAL STANDARD

FOIA "sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978)).  The Act mandates release of properly requested federal agency records, unless the materials fall squarely within one of nine statutory exemptions. *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (citing 5 U.S.C. § 552(a)(3)(A), (b)).  Additionally, FOIA "requires that even if some materials from the requested record are exempt from disclosure, any 'reasonably segregable' information from those documents must be disclosed after redaction of the exempt information unless the exempt portions are 'inextricably intertwined with exempt portions.'" *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citing 5 U.S.C. § 552(b) and *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)).  Exemptions must be "narrowly construed," and "conclusory and generalized allegations of exemptions are unacceptable." *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (quoting *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  An agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates "that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181

(D.D.C. 2017). "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure,' while the 'burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

To carry its burden, the agency must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply." *Elec. Privacy Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). The agency "cannot justify its withholdings on the basis of summary statements that merely reiterate legal standards or offer 'far-ranging category definitions for information,'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 221 (D.C. Cir. 1987)), but it "may rely on declarations that are reasonably detailed and non-conclusory," *Pinson v. U.S. Dep't of Justice*, 245 F. Supp. 3d 225, 239 (D.D.C. 2017); *see also Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (requiring that, to support summary judgment, agency affidavits must "demonstrate that the information withheld logically falls within the claimed exception, and . . . not [be] controverted by either contrary evidence in the record nor by evidence of agency bad faith" (quoting *Miller v. Casey*, 730 F.3d 773, 776 (D.C. Cir. 1984) (quotation omitted))). While reviewing courts should "respect the expertise of an agency," *Hayden v. NSA / Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979), courts review an agency's decision to withhold records *de novo* and will only endorse that

decision if the agency's justification for invoking a FOIA exemption "appears 'logical' or 'plausible,'" *Pinson*, 245 F. Supp. 3d at 239 (quoting *Wolf*, 473 F.3d at 374–75).

The exemptions at issue in this case are Exemptions 1 and 3. Exemption 1 allows the government to withhold information "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy," if that information has been "properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Exemption 3 allows the government to withhold information "specifically exempted from disclosure by statute," if such statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." *Id.* § 552(b)(3). The government relies on the National Security Act of 1947 as the relevant withholding statute under Exemption 3. Def.'s MSJ at 14–15, ECF No. 10-1 (citing 50 U.S.C. § 3024(i)(1)); Final Response Letter, ECF No. 10-2 at 45 (citing "Section 102A(i)(1) of the National Security Act of 1947, as amended," codified at 50 U.S.C. § 3024(i)(1)).

### III. ANALYSIS

The CIA moves for summary judgment as to the validity of its *Glomar* response pursuant to FOIA Exemptions 1 and 3. In its opposition and cross motion, Buzzfeed argues that a *Glomar* response is improper because the President's tweet was an official acknowledgment of a secret program of payments to Syrian rebels the existence of which the CIA can no longer plausibly deny. *See* Pls.' MSJ at 1–2. The "official acknowledgment" (or "official disclosure") doctrine "provides that when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to

that information." *Am. Civil Liberties Union v. CIA* ("*ACLU*"), 710 F.3d 422, 426 (D.C. Cir. 2013).

In *ACLU v. CIA*, the D.C. Circuit discussed the intersection of *Glomar* and official acknowledgment cases. *See* 710 F.3d at 426–27. "*Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information." *Id.* at 426 (quoting *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011)). An agency can only give a *Glomar* response "when confirming or denying the existence of records would itself 'cause harm cognizable under a[] FOIA exception.'" *Id.* (quoting *Roth*, 642 F.3d at 1178) (internal quotations omitted). To apply this rule and determine whether the very existence of records fits in a FOIA exemption, "courts apply the general exemption review standards established in non-*Glomar* cases." *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). "[W]hen a plaintiff seeks to rebut a *Glomar* response by establishing official acknowledgment" the plaintiff must "show[] that the agency has already disclosed the fact of the existence or nonexistence of responsive records . . . 'regardless [of] whether [or not] the contents of the records have been disclosed.'" *Id.* at 427 (quoting *Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1081 (D.C. Cir. 2012).[2] The plaintiff "bear[s] the initial burden of pointing to specific information in the public domain that appears to duplicate that [information] being withheld." *Id.* (quoting *Wolf*, 473 F.3d at 378). "Ultimately," whether or not the plaintiff's argument is based on public disclosure, an agency's justification for invoking a *Glomar* response or any FOIA exemption "is sufficient if it appears 'logical' or 'plausible.'" *Id.* (quoting *Wolf*, 473 F.3d at 374–75).

---

[2] A disclosure by the President has the same effect as a disclosure directly from the agency. *See ACLU*, 701 F.3d at 429 n.7.

At its core, this case presents essentially the same arguments from the same parties as *Leopold I* did. In *Leopold I*, the Court said, "[t]he only contested issue . . . [was] the legal significance the Court should impart to President Trump's July 24, 2017 tweet. *Leopold I*, 380 F. Supp. 3d at 22. Here, too, Buzzfeed concedes that but for that tweet, "the CIA could have properly refused to confirm or deny the existence of a covert program to arm rebels fighting Assad" and thus that the question before the Court is whether the tweet "confirm[ed] the one-time existence of *some* program of payments to Syrian rebels." Pls.' MSJ at 1 & n.1. Of course, despite this focus on the tweet, nothing about the tweet has really changed since *Leopold I*. The variable that has actually been manipulated is the wording of Buzzfeed's FOIA request. A closer review of *Leopold I* is thus an obvious starting point for analysis in this case.

## A.

In *Leopold I*, this Court's analysis began with a closer review of this Circuit's precedents on what constitutes "official disclosure" in the context of a *Glomar* response. *Leopold I*, 380 F. Supp. 3d at 22–24. In *Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990), the Circuit established a three-part test which requires that the information be "as specific as the information previously released," that it "match the information previously disclosed" and that it "already have been made public through an official and documented disclosure." *Leopold I*, 380 F. Supp. 3d at 23 (quoting *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765)). This test was not inconsistent with the Circuit's more recent instruction in *ACLU* that courts should consider whether a *Glomar* response is "logical or plausible." *Id.* (quoting *ACLU*, 710 F.3d at 429). The Court synthesized the two standards by observing that "[i]n essence, while leaving intact the requirement that the information sought be as specific as, and match, the information disclosed,

11

*ACLU* recognized that courts can infer such a disclosure when the statement does not explicitly disclose the information but leaves no doubt as to its existence." *Id.* at 24.

Applying this standard, the Court found in *Leopold I* that "the tweet alone [was] not sufficiently precise" to function as an official acknowledgment that responsive records existed because "Buzzfeed [did] not explain how the tweet reveals the existence of a *CIA* program of payments to Syrian rebels." *Id.* "Even assuming, *arguendo*, that a program of covert payments to Syrian rebels existed, the President's tweet did not mention the CIA or create any inference that such a program would be linked to or run by the CIA." *Id.* at 24–25. The Washington Post article had said that the CIA was behind the payments it was reporting on, but this Court "cannot make [the] assumption" that the President's reference to the article sufficed as an official acknowledgment of this particular detail of the reporting, in particular because the President had suggested that the reporting was inaccurate in some respect. *Id.* at 25. "At most," the Court said, "the tweet revealed that multiple payments were made by the government" or by some other government "to Syrian rebels, that the President ended those payments, and that the Washington Post incorrectly reported on the payments." *Id.* at 25 & n. 4. Buzzfeed had therefore failed to meet its burden of "pointing to specific information in the public domain that appears to duplicate that being withheld." *Id.* at 25.

Buzzfeed had pointed to *ACLU* as establishing that the Court should assume that the CIA was behind any payments, but the Court rejected the comparison. *See id. ACLU* concerned a FOIA request seeking CIA disclosure of "records pertaining to the use of unmanned aerial vehicles ('UAVs')—commonly referred to as 'drones' . . .—by the CIA and the Armed Forces for the purpose of killing targeted individuals." 710 F.3d at 425. As is the case here, the CIA issued a *Glomar* response citing Exemptions 1 and 3 and argued that there had been no official

public acknowledgments to undercut the exemption claims. *Id.* at 425–26. The Agency argued "that it could neither confirm nor deny that it had responsive documents because confirming that it did would reveal that the CIA was either involved in, or interested in, drone strikes (while denying that it did would reveal the opposite)." *Id.* at 427. The district court granted summary judgment to the Agency. *Id.* at 426. The D.C. Circuit reversed because the agency had failed to justify its "refus[al] to say whether it had *any documents at all* about drone strikes." *Id.* at 428. The Agency might have been justified in refusing to say whether it had records concerning drones operated by the CIA, because no official acknowledgment had revealed whether or not the CIA, specifically, operated drones. *See id.* at 428 & n.4. But the ACLU had asked for records concerning the use of drones "by the CIA and the Armed Forces," and numerous public officials, in disclosing the existence of drone strikes, had suggested that "the nation's intelligence capabilities" played a role in targeting drone strikes. *Id.* at 430 (quotations omitted). The Circuit found "it strain[ed] credulity to suggest that [the CIA] does not have an 'intelligence interest' in drone strikes, even if that agency does not operate the drones itself." *Id.* at 430. "[N]o reasonable person would regard as plausible" the notion that the CIA might not have *any* records concerning drone strikes being carried out by *any part* of either the CIA or the Armed Forces. *Id.* at 431. The Circuit sent the case back to the district court for creation of a *Vaughn* index. *Id.* at 432.

**B.**

Returning to the 2018 FOIA request at issue in this litigation, it seems obvious enough that the changes to Buzzfeed's FOIA request are intended to bring this case closer in line with *ACLU* than *Leopold I* was. Rather than focusing on the *CIA* payments that might not exist, Buzzfeed now seeks records concerning "payments" in general. Based on the rule established in

*ACLU*, this change to the request makes enough of a difference that Buzzfeed is entitled to more than a *Glomar* response.

*Leopold I* did not require the Court to "tak[e] a position as to what program, if any, the tweet may have officially acknowledged," *Leopold I*, 380 F. Supp. 3d at 24, but now the Court must confront that question. As in that case, "[t]he Court is not entirely convinced by the CIA's arguments." *Id.* at 24 n.3. The Court agrees with Buzzfeed that there is no logical reading of the President's tweet in which the tweet does not acknowledge that the U.S. government had *some* knowledge of *some* payments to Syrian rebels. *See* Pls.' MSJ at 3 (arguing that it would not be logical "to interpret Trump's accusation that the Washington Post fabricated facts about 'my ending . . . payments' if there were no payments to end"). These payments may not have come from the CIA, and, as the Court observed in *Leopold I*, they may not even have necessarily come from the U.S. government. *See Leopold I*, 380 F. Supp. 3d at 25 n.4 ("Given the coalition of governments that is operating in the region, one could also plausibly assume that the President may have influence over payments made by other governments."). In *Leopold I*, the Court said that "[a]t most, the tweet revealed that multiple payments were made by the government to Syrian rebels, that the President ended those payments, and that the Washington Post incorrectly reported on those payments." *Id.* at 25. Conversely, at the absolute *least*, the tweet revealed that President Trump knew something about payments being made by someone to Syrian rebels.

The CIA argues that "if it were to acknowledge the existence of responsive records in the CIA's possession" this "necessarily would reveal that the Agency had some involvement in any acknowledged payments to rebel groups." Def.'s MSJ at 10, ECF No. 10-1. This argument fails to appreciate the change in the scope of Buzzfeed's request since *Leopold I*. Now that the Plaintiffs are seeking records concerning "payments," not "CIA payments," acknowledging the

14

existence of records responsive to the 2018 request would not reveal anything about whether the CIA had any role in those payments. Acknowledging the existence of records responsive to these reworded requests would reveal only that the CIA had an intelligence interest in payments from *someone*—not even necessarily the U.S. government—to Syrian rebel groups. In addition, the CIA seems to ignore the three entirely new requests made by Buzzfeed in 2018, which are quite broad indeed. They request, for example, "[r]ecords pertaining to payments to Syrian rebels fighting Assad" and "records mentioning or referring to any program to arm or train anti-Assad rebels in Syria." Compl. ¶ 13, ECF No. 1 (emphasis added). The President's tweet officially acknowledged that the federal government had some sort of intelligence awareness of some type of payments. After that tweet—and likely before it as well—it seems wildly unlikely that, in the eight and a half years since the Syrian civil war began, the Central Intelligence Agency has done no intelligence-gathering that produced a single record even *pertaining to* payments Syrian rebels are receiving from *somewhere*, or a single record even *mentioning* or *referring to any program* to arm or train anti-Assad rebels. An across-the-board *Glomar* response[3] is therefore not "plausible" or "logical."

The CIA resists the comparison to *ACLU* by arguing that "several facts, for which there are no analogues here" shaped the analysis in that case. Reply Mem. in Further Supp. of Def.'s Mot. Summ. J. and in Opp'n to Pls.' Cross-Mot. for Summ. J. ("Def.'s Reply") at 7, ECF No. 13. They note that in *ACLU*: "(1) the President and one of his advisors had directly acknowledged U.S. participation in the activity at issue; (2) the fundamental nature of that activity—drone strikes—was logically connected to the CIA's mission of 'gathering intelligence affecting the national security'; (3) that connection was affirmed by the president's advisor, John Brennan . . .

---

[3] With the limited exception of the CIA's offer to search for records responsive to part four of the request, this is what the Agency provided.

; and (4) the CIA Director himself had made public comments about the precision and effectiveness of drone strikes." *Id.* (citations omitted). While the first, third, and fourth facts present a somewhat more robust history of disclosure than is present in this case, nothing in *ACLU* suggests that a single disclosure would have been insufficient. The official disclosure exception does not require multiple overlapping disclosures. As for the second fact—"the fundamental nature of the activity"—the funding and training of non-state paramilitary groups in a war zone in a region where the U.S. has a troop presence seems just as "logically connected" to the mission of "gathering intelligence affecting the national security" as drone strikes do. The CIA also overlooks a distinction between the two cases that cuts in the other direction. The FOIA request in *ACLU* sought only "records pertaining to the use of [drones] *by the CIA and the Armed Forces*" and specifically "for the purpose of killing targeted individuals." *ACLU*, 710 F.3d at 425, 429 (emphasis added). More of a connection to the CIA was thus required to overcome the *Glomar* response in that case, whereas here the FOIA request was intentionally broadened from the request in *Leopold I*.[4] Here, the single act of disclosure is enough to qualify as an official acknowledgment of the government's intelligence interest in the broader categories of records that Buzzfeed has requested.

Today, then, like in *ACLU*, "the CIA ask[s] the courts to stretch [the *Glomar*] doctrine too far—to give their imprimatur to a fiction of deniability that no reasonable person would regard as plausible." *ACLU*, 710 F.3d at 431. But, also as in *ACLU*, "[t]he collapse of the CIA's *Glomar* response does not mark the end of this case" and "the case must now proceed to the filing of a *Vaughn* index or other description of the kind of documents the Agency possesses,"

---

[4] The cases arguably exist on a continuum, with *Leopold I* ("CIA payments") requiring the closest nexus between agency and activity, followed by *ACLU* ("use of drones] by the CIA and the Armed Forces"), and then the instant case ("payments").

and this may be "followed by litigation regarding whether the exemptions apply to those documents." *Id.* at 432. The CIA's files—if any responsive ones exist—will not be indiscriminately released, because this Court retains "considerable latitude to determine [a *Vaughn* index's] requisite form and detail in a particular case." *Id.* It may be "public and relatively specific in describing the kinds of documents the agency is withholding" or may "contain brief or categorical descriptions when necessary to prevent the litigation process from revealing the very information the agency hopes to protect." *Id.* (citing *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 145–46 (D.C. Cir. 2006)). "[T]he agency may submit supporting affidavits or seek *in camera* review of some or all the documents" along with or instead of the *Vaughn* index. *Id.* at 433 (quoting *Judicial Watch*, 449 F.3d at 146). *In camera* review of the index itself may be appropriate "where the district court could reasonably find that public itemization and detailed justification would compromise legitimate secrecy interests." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1385 (D.C. Cir. 1979); *see also ACLU*, 710 F.3d at 433. The D.C. Circuit has even suggested that a "no number, no list" response—acknowledging the existence of responsive documents but refusing to further describe or enumerate them—"might be acceptable "in unusual circumstances, and only by a particularly persuasive affidavit." *ACLU*, 710 F.3d at 433. Even that kind of "radically minimalist" response is "conceptually different" from asking the Court to accept the assertion that there might not be any responsive records at all.

Because the President's tweet makes it implausible for any reasonable person to truly doubt the existence of at least *some* CIA records that are responsive to at least *some* of the nine categories of documents that Buzzfeed requested, Buzzfeed has managed to overcome the Agency's *Glomar* response and the Agency has failed to meet its burden in this case. The Court

will order that the CIA file a new response to Buzzfeed's FOIA request within thirty days. This may include updated justifications for withholdings, new agency affidavits, and a *Vaughn* index. The CIA may seek, if appropriate, to submit all or part of those submissions to the Court for *in camera* review. Buzzfeed may then file responses to these updated submissions within twenty-one days.

## IV. CONCLUSION

For these reasons, it is ORDERED that Defendant's Motion for Summary Judgment is DENIED and Plaintiffs' Cross-Motion for Summary Judgment is GRANTED. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 7, 2019
RUDOLPH CONTRERAS
United States District Judge